UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

    v.

MARCO CAMACHO

No. 15 CR 415–2

Judge Sharon Johnson Coleman

**GOVERNMENT'S MOTIONS TO INTRODUCE CERTAIN EVIDENCE
UNDER FEDERAL RULES OF EVIDENCE 404(b) AND 801(d)(2)(E)**

## **Table of Contents**

Introduction .................................................................................................... 3

Background ..................................................................................................... 5

    I.    Uncharged Communications and Conduct ...................................... 5

        A.    Information Provided by CW1 and CW2 ............................... 5

        B.    Conversations in December 2014 ......................................... 5

        C.    Heroin Distribution in January 2015 ................................. 10

        D.    Narcotics Conversations in January and February 2015 .................... 15

    II.    The Charged Methamphetamine Communications and Conduct ............ 24

        A.    Communications Leading to the February 25th
            Methamphetamine Deal .................................................... 24

        B.    The February 25th Methamphetamine Deal ........................ 32

Argument ..................................................................................................... 40

    I.    Admission of Evidence of Uncharged Conduct under Rule 404(b) ........... 40

    II.    Admission of Coconspirator Statements under Rule 801(d)(2)(E)............. 45

        A.    Governing Law .................................................................. 45

        B.    The Evidence Regarding the Existence of Conspiracies
            and Camacho's Participation in Conspiracies ...................... 51

        C.    The Coconspirator Statements ........................................... 52

Conclusion .................................................................................................... 53

The UNITED STATES OF AMERICA, through JOEL R. LEVIN, Acting United States Attorney for the Northern District of Illinois, respectfully moves this Court for permission to admit at trial certain evidence discussed below under Federal Rules of Evidence 104(a), 404(b), 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). In support of this motion, the government states as follows:

## Introduction

Defendant Marco Camacho is charged with aiding and abetting the distribution of methamphetamine by co-defendant Victor Israel Lozano-Garcia in February 2015. R. 13. The government is preparing to introduce evidence of communications and meetings to establish that Camacho brokered this drug transaction by Lozano to two individuals who, unbeknownst to either Camacho or Lozano, were in fact cooperating witnesses ("CW1" and "CW2"). As a result of filings by Camacho and conversations with defense counsel, the government believes that Camacho plans to argue at trial that he was entrapped into participating in arranging this drug deal.

In this motion, the government seeks permission to introduce under Rule 404(b) uncharged drug-trafficking conduct by Camacho that occurred in the months leading up to the February 2015 methamphetamine deal. According to information from CW1 and CW2, they brokered narcotics transactions for marijuana, methamphetamine, and heroin between various customers and Camacho over the course of years before December 2014. In addition, as a result of conversations between CW1, CW2, and Camacho, consensually recorded by the cooperating witnesses, law enforcement learned that Camacho worked to broker additional

narcotics transactions with CW1 and CW2, including a heroin transaction between the cooperating witnesses and another individual, Individual A, and that as part of that work, Individual A provided a sample of heroin to CW1 and CW2 while all were at Camacho's mechanic's garage and per Camacho's statements. The cooperating witnesses also recorded additional conversations with Camacho, whose telephone law enforcement officers obtained court authorization to wiretap. During those conversations, Camacho further discussed drug dealing.

If Camacho raises an entrapment defense, the purpose of this evidence would be to prove to the jury that Camacho was predisposed to commit drug-trafficking offenses. This evidence would negate Camacho's entrapment defense and is thus admissible under Rule 404(b). *E.g.*, *United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011); *United States v. Rebolledo-Delgadillo*, No. 13 CR 673, 2015 WL 13037308, at *4 (N.D. Ill. Apr. 14, 2015). For these reasons, and those discussed below, the government asks this Court for permission to introduce this uncharged drug-trafficking conduct to prove predisposition.

Additionally, during the course of the investigation, the government obtained court authorization to wiretap Camacho's cellular telephone and an auto wholesale business that Camacho owned located at 14311 S. Western Avenue in Blue Island, Illinois (the "Blue Island Business"). During communications intercepted per these wiretaps, Camacho spoke with individuals, including Lozano and others, about heroin, cocaine, marijuana, and methamphetamine dealing. This motion summarizes the evidence supporting the admission of coconspirators' statements against

4

Camacho and the bases for their admissibility pursuant to Rule 801(d)(2)(E). The government further requests a pretrial ruling of admissibility from the Court, in accord with *United States v. Santiago*, 582 F.2d 1128, 1130-31 (7th Cir. 1978) and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris*, 585 F.3d 394, 398, 400 (7th Cir. 2009).

## Background

**I.      Uncharged Communications and Conduct.**[1]

**A.      Information Provided by CW1 and CW2.**

According to CW1 and CW2, they first met Camacho in or around 2008. Over that period of time, CW1 and CW2 had brokered narcotics transactions for marijuana, methamphetamine, and heroin between various customers and Camacho. CW1 had also witnessed Camacho engage in multiple narcotics transactions, the majority of which took place in the Blue Island Business. CW1 also stated that Camacho had told CW1 that Camacho could provide CW1 with methamphetamine (according to CW1, Camacho referred to methamphetamine as "windows"). In addition, Camacho told CW1 that Camacho also could deliver "China white" to CW1, a term commonly used to mean a form of heroin.

**B.      Conversations in December 2014.**

CW1 and CW2 first began to cooperate with law enforcement in or around November or December 2014. They cooperated in the hopes of getting a benefit for a

---

[1]      In this section, the government does not provide an exhaustive list of recorded conversations and conduct that it may seek to introduce concerning Camacho's uncharged drug trafficking conduct. The conversations and conduct identified here, however, does provide a representative list of what the government may seek to introduce.

third individual who is the cooperators' family member. According to CW1 and CW2, as well as conversations recorded surreptitiously by CW1 and CW2, Camacho spoke with CW1 and CW2 about drug dealing in December 2014. On or about December 5, 2014, at approximately 3:20 p.m., in the presence of law enforcement officers, CW1 placed a consensually recorded call to Camacho. Camacho was using a cellular telephone assigned number (708) 790-3527 (called "Camacho's Phone" in this motion). Law enforcement officers monitored this call.[2] During the conversation, CW1 asked Camacho, "That thing you mentioned before about that guy you brought out to the 95th [meaning 95th Street in the Chicago area]; do you remember? He said he would have a picture of that. What happened with that?"[3] Camacho responded, "They have it there." CW1 asked, "Well, do you think he will have it if I go see him?" Camacho responded, "I'll need to call him." CW1 then said, "Well, call that fucker then." Camacho responded, "OK." Later in the conversation, CW1 said, "That stuff is hard to find." Camacho responded, "No, no, no, it's easy, it's easy, I'll connect you right

---

[2]     Throughout this motion, the government has provided conversations between Camacho and the cooperating witnesses. Unless noted, those conversations were recorded by the cooperators and monitored by law enforcement. In many instances, telephone calls between the cooperators and Camacho were also recorded per court-authorized Title III wiretaps on Camacho's Phone. Additionally, the government intercepted numerous pertinent conversations between Camacho and other individuals through the court-authorized Title III wiretaps.

[3]     The recorded conversations that the government seeks to introduce were conducted in English and Spanish. The government is still in the process of preparing final translations and transcripts of these recordings; the quotations contained in this motion are drafts. At various places, the government has included bracketed interpretations of certain terms and phrases used. Those interpretations come from CW1 and CW2 and in other places from the government's anticipation of what a drug trafficking expert unfamiliar with the specific case could testify was meant. In still other places, the interpretations are based on law enforcement surveillance.

6

now." After the conversation ended, CW1 informed law enforcement that CW1 explained that his reference to a "picture of that" meant a sample of the China white heroin that Camacho previously had told CW1 that Camacho could supply. CW1 also stated that his reference to "the guy you brought out to the 95th" was in reference to a male individual whom CW1 met through Camacho on 95th Street in Chicago, Illinois, before December 5, 2014. According to CW1, Camacho told CW1 that this individual was the person who supplied Camacho with China white heroin.

On or about December 6, 2014, at approximately 11:40 a.m., CW1 placed a consensually recorded call to Camacho, who was using Camacho's Phone. During the call, Camacho stated that he was at the Blue Island Business. CW1 then asked, "Didn't my brother-in-law mention to you about the windows [methamphetamine]?" Camacho responded, "Come over here, come over here." CW1 understood Camacho to be asking CW1 and CW2 to meet Camacho at his Blue Island Business.

Later on or about December 6, 2014, law enforcement met with CW1 and CW2 and provided CW1 with a concealed audio recording device, which law enforcement activated and CW1 used to record the in-person meeting with Camacho. Law enforcement conducting surveillance then observed CW1 and CW2 travel to and enter the Blue Island Business. During the meeting, CW2 asked Camacho if Camacho was in possession of the "little windows [methamphetamine]." Camacho responded, "Let me call him." According to CW1 and CW2, Camacho then briefly stepped away from his meeting with CW1 and CW2 and held a cellular telephone to his ear as he walked away. A short time later, Camacho returned to the meeting with CW1 and CW2.

During the meeting, Camacho explained that he had just called the narcotics supplier multiple times, with no answer. Camacho then asked CW1, "Do you remember the guys who went over there? From the 95th." According to CW1, this was a reference to an individual whom Camacho had brought to 95th Street to meet with CW1. Camacho then said, "There is some there, but he wants to get out of . . . . I mean, what upsets me is that they say one thing . . . ." CW2 responded, "And they change to another?" Camacho then said, "No, and yesterday when I said you know what, this person here is interested in two sets of tires and some twenty-twos." (According to CW1 and CW2, "tires" was code for kilograms of heroin, and two sets of tires equaled eight kilograms. Additionally, CW1 and CW2 explained that "twenty-twos" was code for kilograms of cocaine.) CW1 replied, "No, there are enough for more." Camacho then stated, "No, I told him [Camacho's narcotics supplier] I wanted some twenty-two, some twenty-two and some of the windows . . . . four windows." According to CW1 and CW2, Camacho was informing them that Camacho had asked his supplier for kilograms of cocaine and heroin, and for four pounds of methamphetamine. Camacho then said, "And I told him, you know what, they need four windows [methamphetamine] and a set of 22-inch rims for the pickup of six stud bolts, and he told me, 'No. Well, yes.'" CW1 understood "22-inch rims" to be a reference to cocaine and "six stud bolts" to be a reference to six kilograms of heroin. CW2 then replied, "It's that, the job that was done over there, he said he likes how the windows are."

CW1 then asked Camacho, "What happened to that guy [Arturo]?" Camacho responded, "I told [him] to bring me a piece of the black plastic." CW1 understood the

reference to "black plastic" to mean that Camacho had asked Arturo to bring a sample of the China white heroin to Camacho. CW1 asked Camacho, "When will [he] have [the China white]? When can we meet with [him]?" Camacho responded, "No, we will find him right now." At this point in the recording, Camacho could be heard talking in a telephone conversation to an individual whom Camacho referred to over the phone as "Arturo." In the beginning of the telephone conversation with Arturo, only Camacho's side of the conversation could be heard. According to the recording, Camacho said, "Arturo, what's up? I have my friends here who want to see about the tires [quantities of narcotics]. How do we do this, or what?" Camacho then said, "I'm at the dealer [the Blue Island Business] right now, if you want to come by. And I want to know, what is the number you want from the bank, so they can make the deposit in Mexico." Camacho then activated the speakerphone feature on Camacho's Phone. According to the in-person recording made by CW1, Arturo then told Camacho, "I've been calling you since this morning, but you don't answer." Camacho responded to Arturo, "I wanted to see if you can bring that thing that guy has for the tires, because they are interested." According to CW1 and CW2, Camacho then leaned toward CW1. According to the recording, Camacho told CW1, "This guy works for the Carillos." CW1 responded, "Oh, Amado Carillo?" According to CW1, Camacho then nodded his head up and down, indicating that the answer was yes. According to CW1, Camacho was referring to the Carillo family that heads a cartel in Mexico. According to the recording, Camacho then said to CW1 and CW2, "And they ordered eight ATVs and six tractors." The government anticipates that CW1 will testify that, when Camacho

referred to the "tractors and ATVs," CW1 understood Camacho to mean vehicles that the Carillo family purchased from Camacho for the purpose of smuggling drug proceeds to Mexico. Also according to the recording, Camacho then told Arturo, "This is serious, so I want you to move." Arturo responded, "Yeah, but I have to go get it from where it's at, where I told you it was. Let me finish eating and I will call you back." Camacho then hung up, and the cooperators left the Blue Island Business.

### C. Heroin Distribution in January 2015.

According to CW1 and CW2, as well as conversations that they surreptitiously recorded, they had additional drug-trafficking conversations with Camacho in early January 2015. Moreover, as a result of those conversations, Camacho introduced CW1 and CW2 to an individual whom Camacho called "Antonio" and "Tony." At Camacho's Blue Island Buisness, CW1, CW2, and Camacho met with Antonio in person, and while they were all together, Antonio provided CW1 and CW2 with a sample quantity of a type of heroin commonly known as "black tar heroin."

Specifically, on or about January 3, 2015, at approximately 5:15 p.m., CW1 received a call from Camacho, who was using Camacho's Phone. During the conversation, Camacho said, "Oh, what was I going to tell you? I wanted to show you something that is worth it for you. . . . Come over so I can show you something." Camacho then told CW1, "Arrange what you told me." CW1 responded, "Of what? . . . The thing with my brother in-law [CW1 was asking about the discussed methamphetamine transaction] or what I commented to you about?" Camacho replied, "Your thing, what you told me." CW1 then said, "Really? You called that buddy already?" Camacho responded, "No. Look, they are coming over here now. . . .

Well, you're close by [close to the Blue Island Business], man." CW1 replied, "Well, I'm nearby but . . . ." Camacho then said, "Come on, man [*unintelligible*]." CW1 responded, "Well, what time is the comrade arriving?" Camacho answered, "He's on his way now." CW1 responded, "He's on his way?" Camacho said, "He's coming from Hammond, yes." CW1 then said, "Fuck man, call me when he gets there. . . . Call me when he gets there, I'll go there right now. Call me when he gets there, so I can go . . . . Because I don't want to go and then see somebody that I don't know." Camacho replied, "No, no, no, no. Come over, because he's on his way already. I'm telling you, I just finished giving him the address and everything [CW1 understood Camacho to mean that he told the supplier the address of the Blue Island Business]." CW1 then asked "OK. In how much time will that guy arrive?" Camacho responded, "Fifteen minutes, in twenty he will be here." CW1 replied, "Good. Call me when he gets there."

Later that evening, at approximately 6:43 p.m., CW1 received a call from Camacho, who was using Camacho's Phone. During the conversation, Camacho asked CW1, "Are you coming or what?" CW1 responded, "Well, you haven't called me. Is he ready?" Camacho replied, "Yeah, he's already here." CW1 then said, "You told me, 'I'll call you in twenty minutes. . . .'" Camacho responded, "You should have already been here." CW1 replied, "I'll be there [the Blue Island Business] in five minutes." Camacho answered, "All right, I'll wait for you here."

Following the call between Camacho and CW1, HSI agents searched CW1 and CW2 for illegal contraband with negative results. Agents then provided CW1 with a concealed audio recording device, which the agents activated. At approximately

11

7:00 p.m., surveillance observed CW1 and CW2 arrive at and enter the Blue Island Business. There, CW1 and CW2 met with Camacho. According to CW1 and CW2, when they arrived at the meeting, CAMCHO introduced them to a male individual who identified himself as "Antonio." Also according to CW1 and CW2, during the meeting, Antonio provided CW1 with a small package that Antonio told CW1 and CW2 contained heroin.

According to the recording from the device in CW1's possession, during the meeting, Camacho said, "What's up, my [*unintelligible*]? CW2 responded, "How are you, sir? . . . What's up, Gato?" Camacho then made a comment that cannot be heard clearly on the recording, after which, CW2 said, "Antonio [CW2 was meeting Antonio]." Camacho then said, "[*Unintelligible*] about the windows." Antonio said, "Oh, crystal [which CW1 and CW2 understood to mean methamphetamine]." CW2 asked, "Oh, yeah?" Antonio then said, "Well, I don't know. . . . There is a shit load . . . [*unintelligible*]." CW2 asked, "How much is that one for?" Antonio responded, "I think . . . . The last one that [*unintelligible*]." CW1 then said, "At three bucks [CW1 meant $3,000 per pound of methamphetamine]." Antonio responded, "Oh. . . . No, yes. At three bucks." CW2 answered, "All right."

A few moments later, Antonio could be heard talking to an unidentified male ("UM1") individual over a telephone. The speakerphone feature on Antonio's telephone was turned on. Although the recording made by CW1 captured Antonio's statements to UM1 and UM1's statements to Antonio, not all of UM1's statements were recorded clearly by CW1's recording device. During the conversation between

Antonio and UM1, Antonio said, "Hey, buddy. I have a question." UM1 responded, "Go ahead." Antonio asked, "Of those windows [methamphetamine] . . . about how many do you have left? The clear ones. The ones that are [*unintelligible*] and are blond." UM1's response was not recorded clearly by CW1's recording device. Antonio then asked, "How many? How much? It's for a buddy of mine. It's a price that . . . . The, the one I took to Arkansas." UM1 again responded, but the response was not recorded clearly. Antonio then said, "No problem. OK [*unintelligible*]. That's fine [*unintelligible*]. I'll talk to you right now. Bye."

Antonio then continued his conversation with Camacho, CW1, and CW2. CW2 asked, "How much?" Antonio answered, "Five thousand [CW1 and CW2 understood Antonio to mean $5,000 per pound of methamphetamine]. . . . He's going to give me the price he told me so that we buy several. . . . Well if you want right now . . . you can go take out the money, and I will go bring it to you." CW2 said, "No, well I need to see it because last time I was calling you. . . . You never called me, and we are working in the snow so I need to see you tomorrow." A few moments later, Antonio said, "[*Unintelligible*] all big pieces [CW1 and CW2 understood Antonio to be describing the methamphetamine as being in big pieces]. . . . Either way, I'll keep it with me." CW2 said, "Damn." A few moments later, Antonio said, "I put it in the sun . . . . For real, I put it in the sun and, and I lower [*unintelligible*] and once I lower the [*unintelligible*], I smash it and I put it in the sun again for a few hours then [*unintelligible*] very white [*unintelligible*]." (CW1 and CW2 understood Antonio to be

describing the production of methamphetamine.) A few moments later, Antonio said, "Like a cut and if not I even smoke it. [*Unintelligible*]." CW2 said, "Damn."

Also according to the recording, later during the conversation, Antonio discussed heroin with Camacho, CW1, and CW2. During the conversation, CW1 asked, "How much is that one going for?" Antonio responded, "Like forty." CW1 replied, "No, no not that much." Antonio then said, "How much is it right now? What did the friend tell me? I don't remember if he said thirty-four [$34,000 per kilogram] or forty-four [$44,000 per kilogram]. I'm not quite sure. . . . [*Unintelligible*] thirty-four [$34,000 per kilogram]. Maybe since [*unintelligible*] he wants to earn like two thousand [$2,000]." Later during the conversation, Antonio said, "He's right. You know how there is a clear one, a white one, a colored one?" CW2 answered, "Yeah. yeah." Antonio continued, "And there is a lighter one and one that is stronger [CW1 and CW2 understood Antonio to be discussing different forms of heroin]. Either way that's the price that he wants."

Camacho then said, "Look right now . . . the fucker from Cuernavaca [a town in central Mexico, near Mexico City] called me. He told me, 'Call my cousin dude.' [*Unintelligible*]. I called them . . . since the other day . . . . It's just that I said, 'Is he fucking with me or what?' 'No, they are on Archer. No way, dude.'" CW2 asked, "Where?" Camacho responded, "By Archer [Archer Avenue in Chicago]. He told me he was by Chicago and shit. I told him, 'You tell me one thing and then another, [*unintelligible*].' You understand me?" CW1 asked, "With Arturo?" Antonio responded, "Arturo, yes."

CW1 then said something that was not recorded clearly. Antonio responded, "Well, this is what is there now." CW1 again said something not recorded clearly. Antonio responded, "[*Unintelligible*]. It's China [CW1 and CW2 understood Antonio to mean China white heroin]." CW1 responded, "Oh." A few moments later, Antonio said, "If you check this one, it will [*unintelligible*]." CW2 responded, "Yeah." Antonio then said, "That one is the black tar [another type of heroin]. . . . Have him check it out to see if he likes it. If not, there is bone [another type of heroin]. There is china [China white heroin]." A few moments later, Antonio said, "That one is black tar." According to CW1, at that point in the conversation, Antonio handed CW1 a black, tarry substance wrapped in plastic. According to the recording, Antonio then said, "There is China white [heroin] that is clearer." CW1 then asked, "How much is the pound of this one [the Black Tar heroin]?" Antonio answered, "I would have to see." Several minutes later, the conversation ended.

Following the meeting, surveillance observed CW1 and CW2 exit from the Blue Island Business and followed CW1 and CW2 back to a predetermined meeting location. Agents then recovered and deactivated the audio recording equipment and also searched CW1 and CW2 for contraband, with negative results. Additionally, agents took possession of the black, tarry substance wrapped in plastic that Antonio had provided to CW1 in Camacho's presence and facilitated by Camacho.

### D. Narcotics Conversations in January and February 2015.

Conversations and meetings continued between Camacho, CW1, and CW2 following the January 3rd meeting, and these subsequent conversations also often involved drug trafficking.

For instance, on or about January 19, 2015, at approximately 3:55 p.m. (Session 8336), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, Camacho said, "I need some money, man." CW1 responded, "[*Mumbles.*] Let me work with those cars [*unintelligible*]. Fucking great. Listen, my friend from Michoacán just called." Camacho asked, "What happened?" CW1 responded, "What's your standing with that guy? It's no lie or such, so we can arrange something with him." Camacho answered, "No, no. I was telling you. . . . He called me a while ago. He called me a while ago." CW1 asked, "Oh, the guy called you?" Camacho responded, "Yes, yes. He asked me how the situation was. 'I don't know,' I said. 'Hold on.'" CW1 then asked, "So, the minimum is three, six, right?" Camacho answered, "Yes." CW1 then said, "But tell him not to fuck around." Camacho responded, "I already told that motherfucking son-of-a-bitch, man." CW1 then asked, "Yeah, but then what's left for us?" Camacho responded, "I already told him, honestly. I was trying to lower it, but the guy said thirty-six inches." Anticipated testimony from CW1 as well as from a drug-trafficking expert whom the government anticipates having testify at trial will establish that references to "thirty-six" in this conversation were to the price Camacho's supplier was charging per kilogram of cocaine. The government more generally anticipates that CW1 will testify that this conversation involved Camacho arranging the sale of kilogram quantities of cocaine from Camacho's supplier to CW1 and CW2.

The conversation continued. CW1 asked, "Is it going to be more than two pairs of shoes?" Camacho responded, "Like two boxes of shoes [two kilograms of cocaine],

16

right? I can ask him, if you want. But I don't think so." Later in the conversation, CW1 said, "Go and tell him so I can go and see the buddy, if it gets set." (According to CW1, CW1 was pretending that he had a customer ready to buy the cocaine that Camacho's supplier wanted to sell.) Camacho responded, "I'm telling you, yes. I'll tell him right now, but . . . I told him, 'Don't mess around.' 'It's not possible, man,' he says that he works the drywall really well [Camacho's supplier told Camacho that the cocaine would be good quality]." CW1 then said, "That's what I'm saying, and he probably can get rid of 10 sheets a week [CW1's pretend cocaine buyer would be prepared to buy 10 kilograms of cocaine per week]." Camacho responded, "Really? Motherfucker . . . . How can I do it? OK, I'll call you right back. It's not bullshit. It'll happen." CW1 replied, "All right then."

Camacho then asked again about the contemplated two-kilogram purchase. Camacho asked, "But you do want two shoe boxes, right?" CW1 responded, "If you want, I'll even invite you over, so you can meet the buddy." Camacho responded, "No, no, no. I'm just telling you that only two, right?" CW1 replied, "Yes. I mean, above two. Tell him because I don't know [*unintelligible*]." Camacho then asked, "No, no. But right now what? You want two or what?" CW1 responded, "Yes, you can fix two if you want with the buddy." Camacho replied, "OK."

About thirty minutes after the call with CW1 began (Session 8348), Camacho, who was using Camacho's Phone, had a telephone conversation with an individual whom Camacho called "Paco." During the conversation, Camacho said, "They need two boxes of material [CW1 and CW2 wanted two kilograms of cocaine]." Paco

responded, "Of course." Camacho then said, "OK. That's the least, but they're going to want like ten [CW1 and CW2 were interested in buying ten kilograms of cocaine]." Paco responded, "Yes, that's the least." Camacho replied, "All right, fine. . . . Let me talk to him and see what he tells me and I'll call you back soon. Wants about three, right?" Paco answered, "Yes." Camacho then said, "All right, man. Bye."

Minutes after Camacho spoke with Paco (Session 8352), Camacho, who was using Camacho's Phone, had another telephone conversation with CW1. During the conversation, Camacho said, "That the boxes of material, the dry wall, well is the least he can do." CW1 responded, "Well, that doesn't give us enough room for us to move around." (The government anticipates that CW1 will testify that he understood Camacho to mean that his supplier would not charge less than $36,000 per kilogram, meaning that CW1 and Camacho would not make much profit in reselling the drugs.) Camacho said, "Well, I told him, 'Well, you do what you think is best'." CW1 then said, "Listen, let me call the friend." Camacho responded, "OK. He's set to bring you the material." CW1 replied, "And then it's all set. I'll see if I can settle things with him later, a little later on and then . . . ." Camacho then said, "But just [*unintelligible*] . . . . So I can tell these guys to come over here." CW1 responded, "OK. Yes, all right."

The next day, on or about January 20, 2015, at approximately 11:44 a.m. (Session 8742), Camacho, who was using Camacho's Phone, had a telephone conversation with Paco. During the conversation, Camacho said, "Two boxes of materials are going to get done later." Paco responded, "All set. Let me know."

Camacho then said, "I think it's going to be like 10 because they have a shit load drywall sheets to put up." Paco responded, "OK, that's good." Camacho replied, "But they will let me know later." The government plans to argue that this call was in response to Camacho's call with CW1 the day before during which Camacho agreed to arrange the sale of 10 kilograms of cocaine to CW1.

On or about January 21, 2015, at approximately 3:57 p.m. (Session 9432),[4] Camacho, who was using Camacho's Phone, had a telephone conversation with Paco. During the conversation, Camacho said, "He needs to know/see what kind that thing is." Paco responded, "[*Unintelligible*] let me see later on, because they just left to, um . . . . They went to put one over there in, um, shit! It's like 2 hours from here." Camacho then said, "It's just that those guys . . . . Um, if you want bring me that thing . . . just a roll [*unintelligible*]." Paco responded, "OK." Camacho then said, "But make sure it happens for sure, all right dude?" Paco responded, "OK. All set."

On or about January 24, 2015, at approximately 5:39 p.m. (Session 10727), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, CW1 asked, "So what happened with the sample [CW1 was asking about the sample of narcotics that Camacho's supplier was supposed to bring for CW1 and CW2]?" Camacho answered, "No, this guy didn't bring it to me, because, um . . . . I don't know what the deal is with these guys. I need to call him right now. Let me call him." CW1 said, "Well, it's just that I need to go see the guy, but I called

---

[4] CW1 and CW2 met with Camacho at the Blue Island Business on or about January 21, 2015, at approximately 2:30 p.m. to about 3:30 p.m. During the meeting, Camacho discussed vehicles with CW1 and CW2.

you yesterday and thought, 'Hopefully, he'll bring me the . . . .'" Camacho responded, "And what did he say about the other one? The new work?" (The government anticipates that CW1 will say that he understood Camacho to be asking about a separate drug customer CW1 had pretended to Camacho was able to buy drugs from Camacho's supplier.) CW1 answered, "Well, it's just that the guy hasn't arrived. The fucker is also not answering." Camacho replied, "Oh, OK." CW1 then said, "I keep calling him, but he hasn't answered. I need to go see him, but I need to take something to him." Camacho responded, "Yeah." CW1 then said, Because if I go just like that, it kind of doesn't make sense. It's not worth the trip." Camacho then said, "I will call him right now [Camacho planned to call Paco]." CW1 responded, "Have him bring a picture, so I can go see him. That way I can take something to him and not make it as obvious, because if I go just like that, he's going to be like, 'This guy bothers me too much.'" (The government anticipates that a drug trafficking expert may testify that "picture" is a word commonly used in the drug trade to mean a sample. The government further believes that CW1 will testify that he meant narcotics sample when he used the word "picture" and that he believed that Camacho also understood the word's usage.) Camacho replied, "No, let me call him."

Less than 20 minutes later, at about 5:56 p.m. (Session 10734), Camacho, who was using Camacho's Phone, had a telephone conversation with Paco. During the conversation, Camacho asked, "What happened with the fucking grass, dude?" Paco responded, "They won't bring it until later on." Camacho asked, "Honestly?" Paco answered, "Yes. . . . I'll call you as soon as they drop it off." Camacho responded, "Yes,

man. All right." Paco asked, "And with other kind, nothing happened? Right?" Camacho responded, "Well, well yes, man! We're waiting for them to bring the . . . cash, with that guy for the construction." Paco replied, "All set." The government plans to argue that Paco asked about the deal that Camacho had been discussing with CW1 and CW2 and that Camacho explained to Paco what CW1 had told Camacho.

On or about January 27, 2015, at approximately 1:48 p.m. (Session 11226), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, Camacho asked, "Do you, do you remember the . . . black tires that were given to you? The other day?" CW1 responded, "Yes." Camacho said, "They, they have eight, eight tires." CW1 responded, "I have not spoken at all about that shit. Everything came out bad with those assholes." Camacho then said, "Well, that shit is here." The government anticipates that CW1 will testify that he understood Camacho to be asking about whether CW1 recalled receiving the sample of heroin from Antonio and the Blue Island Business with Camacho and that Camacho was letting CW1 know that the supplier had eight kilograms of that heroin available for sale.

On or about February 4, 2015, CW1 and CW2 met in person with Camacho at the Blue Island Business. CW1 wore a recording device and consensually recorded the conversation. During the conversation, CW1 said, "When I ran into the . . . man. I was getting home from work and so was he." Camacho responded, "I'm going to [*unintelligible*] and tell him, 'You know what, asshole?' And I'm going to tell him, 'Paco, the dudes are here just tell me what's up.' [*Phone ring*.] Oh, it's him." CW1

21

responded, "There you go." At that moment (Session 13601), Camacho, who was using Camacho's Phone, received a call from Paco. Camacho answered the phone in CW1's and CW2's presence. During the conversation (which was recorded per the court-authorized wiretap on Camacho's Phone), Camacho asked, "Hey, what's' up with the landscaping guys? They want you to build them a home." Paco responded, "Oh shit. I forgot." Camacho then said, "Yes, they need . . . . It's a new house. It's by Hickory Hills . . . . I don't know where, Palos Hills. Who fucking knows? It's, it's about 200 square feet." Paco responded, "OK. It's going to be there at the dealer right now. I'll come by like at 5:30 to 6:00." Camacho replied, OK." Camacho also said to CW1 and CW2, "He's coming around 5:30, 6:00."

The conversation between Camacho, CW1, and CW2 at the Blue Island Business then resumed. Later in the conversation, CW1 told Camacho, "Tell that asshole Paco to get it together." Camacho responded, "Yes." CW1 then said, "And we'll get on it. I was going to go right now to see this dude in the evening. I said, 'I'm going to go see the dude.' He told me to come by. Maybe he has something good for me." Camacho then asked, "Who did you give the, the little ball to? What I gave you? To that dude?" (The government anticipates that CW1 and CW2 may testify that Camacho was referring to the sample of heroin from January 3, 2015.) CW1 asked, "To that dude and to uh . . . ." Camacho asked, "And what did he say?" Voices overlapped and could not be heard on the recording, and then CW1 said, "Well the one that sampled it was my buddy [*unintelligible*]." Camacho asked, "What did he say?" CW1 responded, "I just showed it over here. I told him, 'It's because I can't give

it to you. What about the other one?'" Camacho asked, "And what did he say?" CW1responded, "I should have taken it, right? Didn't I tell you what he told me? That's it's badass." Camacho responded, "Yeah, it's badass." Later in the conversation, Camacho said, "No, this fucking Paco is really straight."

Camacho had additional calls and in-person meetings in early February 2015 with CW1, CW2, and Paco. In particular, on or about February 5 and 6, 2015 (Sessions 13904, 14024, 14084, 14090, 14093, 14097, 14139, 14150, 14154, 14155, 14162, 14167, 14169, 14174, 14205, 14274), Camacho discussed with CW1 and CW2 the potential sale of five kilograms of cocaine to CW1's and CW2's purported customers. Interlaced in these conversations were conversations between Camacho and Paco concerning Paco providing the cocaine for this contemplated transaction.

On or about February 16, 2015, at approximately 4:40 p.m. (Session 16823), Camacho, who was using Camacho's Phone, had a telephone conversation with Paco. During the conversation, Camacho said, "Hey, what happened with the other?" Paco responded, "It hasn't been able to do, dude." Camacho asked, "I imagined. Nothing, nothing?" Paco responded, "Nothing." Camacho then asked, "Not even the guy who works in construction?" Paco responded, "Nothing. It was good at 11%. We did not get it, and now it's more." Camacho then said, "You know what? I'm going to let this fucker know. He's bothering me every fucking day." Paco responded, "I know. I was just with those guys, and well you know how that is." Camacho then said, "I'll call you back because he just called me. I'll call you back." Paco responded, "OK. Call me." Camacho replied, "Yes, hold on."

23

About 25 minutes later (Session 16837), Camacho, who was using Camacho's Phone, sent a text message to Paco. In the message, Camacho wrote, "Call me." At about 7:45 p.m. that same day (Session 16878), Camacho, who was using Camacho's phone, had a telephone conversation with Paco. During the conversation, Camacho said, "I told those fuckers to hold on. . . . Can you believe they wanted ten sheets of dry wall? That's crazy." (The government plans to argue that this reference to "ten sheets of drywall" was actually a reference to the 10 kilograms of cocaine that CW1 had discussed with Camacho purchasing from Camacho's supplier.) Camacho and Paco then briefly discussed car titles, and later in the conversation, Paco stated, "I'll come by tomorrow." Camacho replied, "All right."

## II.    The Charged Methamphetamine Communications and Conduct.

Beginning in the middle of February 2015, Camacho and the cooperating witnesses discussed the distribution of methamphetamine. These discussions led to the charges alleged in the indictment of co-defendant Victor Israel Lozano-Garcia distributing about one pound of methamphetamine to CW1 and CW2 in a deal brokered and arranged by Camacho.

### A.    Communications Leading to the February 25th Methamphetamine Deal.

On or about February 18, 2015 (Sessions 17141, 17192, 17212, 17224, 17229, 17234, 17240, 17253), CW1 and CW2 spoke over the phone with Camacho and also met twice with Camacho at the Blue Island Business. The cooperating witnesses surreptitiously recorded those conversations. The second time they met in person was in the afternoon. During the conversation, CW2 said, "But it seems like the guy

24

panics, man." The voices then could not be understood on the recording as they overlapped, but Camacho then said, "Yes." CW2 asked, "Why? [*Unintelligible*]." Camacho then said, "[*Unintelligible*] fucking Israel [co-defendant Victor Israel Lozano-Garcia] is on his ass." CW2 responded, "Then the fuckers have reason to be cautious." Camacho replied, "Yes, he was scared, the fucker. [*Unintelligible*]."

On or about February 19, 2015, at approximately 11:23 a.m. (Session 17331), Camacho, who was using Camacho's Phone, had a telephone conversation with Lozano. During the conversation, Lozano said, "Well, he didn't come." Camacho said, "The thing is that . . . . What?" Lozano responded, "He didn't come to install the doors." Camacho asked, "He didn't go?" Lozano responded, "No." Camacho then said, "Hold on a bit, let me call. Lozano responded, "All right."

About two minutes later, at approximately 11:25 a.m. (Session 17333), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, Camacho asked, "Listen, where's [CW2]?" CW1 responded, "Hold on a sec. . . . Hey, fellow countryman. What's up?" Camacho then said, "They were waiting. . . . That guy [*unintelligible*]." (Based on the timing of these calls, the government anticipates arguing that, when Camacho said that "*they* were waiting," Camacho was referring to Lozano.) CW1 responded, "Yeah. I was just going to call you because [CW2] called me. [CW2's family member] got really sick, and [CW2] took [CW2's family member] to the hospital." Camacho replied, "Oh, OK." CW1 then said, "I'm waiting for [CW2] to get out of the hospital. Then we'll go see him. We'll go to where you are. We'll meet wherever. As soon as [CW2] gets out." Camacho responded,

25

"OK. Sounds good. Yeah, let me call him, then." Later in the conversation, CW1 said, "Tell your buddy not to get upset; that it'll all get done there. As soon as [CW2] gets out of the hospital. I don't even know what time [CW2] went, but we're on that right now." Camacho responded, "All right. All right." CW1 replied, "All set."

About two minutes later, at approximately 11:27 a.m. (Session 17334), Camacho, who was using Camacho's Phone, had a telephone conversation with Lozano. During the conversation, Camacho said, "It's because [CW2's family member] got sick. [The family member] got sick last night." Lozano responded, "Oh yeah?" Camacho then said, "Right now, [CW2 was] in the hospital. . . . [CW1] just told me that as soon as [CW2] gets out, [CW2] will call me so we can get in touch." Lozano responded, "OK. Well . . . . This is my number of the place, so [*unintelligible*] pick up right away." Camacho replied, "But that, yes. He'll give you the work. It's not a problem." Lozano then said, "That's fine, so we can install them at least." Camacho responded, "All right." Lozano then said, "They're three, just three doors." Camacho responded, "All right." The government plans to argue that CW1 and CW2 attempted to purchase a quantity of methamphetamine from Lozano in a transaction brokered by Camacho. Lozano informed Camacho that Lozano would supply methamphetamine in three-pound increments.

Later that evening, at approximately 6:25 p.m. (Session 17434), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, CW1 asked, "Where are you? Are you at your business [the Blue Island Business]?" Camacho responded, "Yes." CW1 then said, "I'll stop by there right now

then." Camacho asked, "In how long?" CW1 responded, "In like ten minutes." Camacho replied, "All right. Bye."

A short time later, CW1 and CW2 met in person with Camacho at the Blue Island Business. CW1 wore a recording device and consensually recorded the conversation. During the conversation, Camacho asked, "What's up?" CW2 responded, "It's like this dude, it's because this fucking dude doesn't want what, what [*unintelligible*]." Camacho asked, "He doesn't want what?" CW2 responded, "The three." Camacho asked, "He wants it all?" CW2 said, "Look . . . ." Camacho asked, "[*Unintelligible*] understand [*unintelligible*]?" CW2 said, "Right now . . . . I have all the paper there, dude. It's because [*unintelligible*] son of a bitch!" Camacho responded, "In other words he/you want the, the . . . ." CW2 subsequently said, "He wants [*unintelligible*] bad ass. He said, 'Look, [*unintelligible*] fucking. There's no problem with me.' The problem is that the dude wants to leave already tomorrow. Look, it's twenty for us dude." Camacho responded, "Damn, no kidding." CW2 then said, "All right? For me, for me, for you, and [CW1]. [*Unintelligible*]." Camacho then said something that could not be heard on the recording. CW2 then said, "Which… you see the dude. It's because he's saying . . . with three . . . I already told you the dude is going to Michigan." Camacho responded, "Yeah." CW2 said, "He said, 'Look, it's not worth it to me. I'm not going to split up my money for three, dude. I'm, I'm going . . . . If I'm going to do that work I'm going to leave.' It's because the dude means business." Camacho responded, "Son of a bitch." CW2 then said, "And, no. The dude right now . . . he said, 'Take it dude.' I didn't want to, son of a bitch, this dude is. It's

twenty, for me, you, and [CW1]. We'll do the fucking deal. Fucking twenty bucks.
Camacho responded, "Son of a bitch. It's because this dude is afraid. Motherfucker!"
CW2 then said, "But fucking dude. But why? Now look, the dude . . . well, if he's
whipped, we'll look for another fucking . . . . So, OK, then. [*Unintelligible*] because the
dude was really scared. He was, he was here and said . . . [*unintelligible*] the dude. I
have the money there in the trunk, and if you doubt it, I can show you. Don't
think . . . . I'm not with lies." Camacho responded, "No, I know, I know, I know."
Camacho subsequently said, "Let me call this motherfucker. And the motherfucker
called me, OK?" CW2 asked, "He called you?" Camacho responded, "Yeah in the
morning. He said, 'Do you have [*unintelligible*] the telephone?' Son of a bitch." CW2
replied, "That's why I like him, dude. [*Unintelligible*] just that I told, fucking
[*unintelligible*] fucking dude."

At that moment, which was at approximately 6:40 p.m. (Session 17437),
Camacho, who was using Camacho's Phone, called Lozano. During the conversation,
Camacho said, "Hey, these guys who bought the house over there in Indiana [CW1
and CW2] want the ten windows." (The government anticipates that its drug-
trafficking expert may testify that the word "windows" is commonly used to mean
methamphetamine because of the glass-like appearance of the drug when it is first
manufactured.) Lozano responded, "Oh, no. . . . It's fucking tough because it's fucking
cold right now as you can see. It's not possible to work outside right now because it's
fucking cold." Camacho then said, "Yes, it's tough right?" Lozano responded, "Yeah,
the weather is really bad outside." Camacho then said, "Yeah. It's because those guys

are renting and they need to go somewhere to go live and the only they can is that way. They need the 10 fucking windows so they can go live there. Fix this shit and the dudes can go even if it's without furniture. They can lay down on a fucking mat. They don't give a fuck." Lozano responded, "That's the only way, but I need to ask who can handle the cold because not anyone can handle the cold. It's ugly outside. It's 20 below zero right now to be working outside installing windows, well, no, no. Maybe the way I told you it can be done." Camacho replied, "Yeah." Lozano then said, "It's because you/we won't know what's up. You understand me?" Camacho responded, "Yes. Well let me call, and I'll call you back." Lozano replied, "OK."

Later that evening, at approximately 7:53 p.m. (Session 17448), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, CW1 asked, "So what do you think? Will it get done through there?" Camacho responded, "No, you know what? I'm seeing those guys because they did not have any work and now that there is work they don't want to. Fucking shit." CW1 then said, "Well that's the problem. Look, this fucker was telling me right now. The one who just called me. He spoke to the buddy. It's because he wants to get the fuck out of here. . . . He's telling me that he's going to see if . . . . He's telling me that he's going to try and see if he can stay a bit longer. Well see if the dude wants to." Camacho responded, "Yeah." CW1 said, "He wants to leave already because he saying he's wasting a lot of time with us. Well he's the one who is with that guy. . . . That's why I'm telling you. How do you see things? Do you think something can get done so that he can tell him to wait or should he just leave?" Camacho responded, "Well, I need

29

to . . . . That dude is still the same, he says he only has three workers. He said, 'I don't have people right now. I haven't contracted people because it's cold and I cant' have more people working.'" CW1 then said, "Look, let's do something. Let me talk to him right now and depending on what he says. If he says that, well, at least let's do those." Camacho responded, "Well, I'm telling you that those three fuckers are there. He said, 'No. Tell him I only have three workers.'" CW1 then said, "Yeah, but I'm not going to give you or him anything, I'm going to get the six because . . . . Let me talk to him. Let me see what he tells me, if he wants to do something, we can do it tomorrow."

On or about February 24, 2015, at approximately 11:09 a.m. (Session 18518), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, CW1 asked, "Where are you? Are you around?" Camacho responded, "Yes." CW1 said, "It's because that fucker called me that he wants to see you." Camacho asked, "Who?" CW1 said, "My brother-in-law. . . . My brother-in-law is . . . ." Camacho responded, "Well I'm here at the business right now." CW1 said, "When he arrives I will be . . . head over there." Camacho responded, "All right."

Camacho and the cooperating witnesses later met at the Blue Island Business. Following that meeting, at approximately 2:41 p.m. (Session 18602), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, CW1 asked, "What's up? What's been going on?" Camacho responded, "Well, I went to see . . . went to look for him and I didn't, I didn't find him. His fucking car is not there, man." CW1 asked, "You couldn't find him?" Camacho responded, "No, his fucking car isn't' there right now." CW1 asked, "Do you think something will get

done by . . . ? Should we wait for tomorrow or at nighttime or . . . ?" Camacho responded, "I'm going to stop by there again. I'm going to stop by there again right now, because I need to check out his car." CW1 asked, "What do you think, man? Arrange all that for tomorrow, man, so that you're not rushing around?" Camacho responded, "No, I will, right now. In a little bit. Hold on. We'll resolve that right now." CW1 replied, "Fine. Arrange that, then and give me call back."

At approximately 4:15 p.m. (Session 18643), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, CW1 asked, "[*Unintelligible*] with this guy?" Camacho responded, "Well, I'm trying to get a hold of him [*unintelligible*]. I already told this guy who have me his number last time. I told him, 'If you see that he arrives, tell him yeah? Please to call me or to go see Marcos at the dealer.' He said, 'Yes, as soon as I see him right now, well, I'll tell him.' 'Well, OK. Please.'" CW1 asked, "But do you think something will get done today? If not to tell them to wait until tomorrow." Camacho responded, "Gosh, man! We should've done it since the other day, right? . . . I mean, we should've done since the other day." CW1 replied, "Oh, no, but that was also a different guy, fellow countryman." Later in the conversation, CW1 asked, "What do you want me to do?" Camacho responded, "I'll let you know shortly, shortly."

At approximately 6:00 p.m. (Session 18698), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, CW1 asked, "What's going on with that guy or what?" Camacho responded, "Well no, son of a bitch. No, he hasn't arrived yet, man. No . . . . He hasn't arrived since . . . . I

31

told them to call me, please." CW1 asked, "Do you want him to switch us until tomorrow? Or what do you want?" Camacho responded, "Yes, of course." CW1 asked, "Yeah? Around what time should I call you?" Camacho responded, "No, I . . . . Let me head to his house. From, from my house I will head that way to go see the dude." CW1 asked, "OK. But around what time do you want me to call you? So I can call these people here so they can bring the paper." Camacho and CW1 then discussed timing for the next day.

**B.    The February 25th Methamphetamine Deal.**

The drug deal charged in the indictment in this case took place on or about February 25, 2015. At approximately 10:12 a.m. that morning (Session 18806), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. Audio was not recorded via the wiretap interception on Camacho's Phone, but CW1 consensually recorded the conversation, which was monitored by law enforcement. During the conversation, CW1 asked Camacho if the transaction was going to take place that day, and Camacho instructed CW1 to wait because Camacho had not yet located his narcotics supplier (that is, Lozano). Camacho then asked CW1 if CW1 wanted one or two pounds of methamphetamine, and CW1 replied that CW1 wanted one pound. At approximately 12:13 p.m. (Session 18871), Camacho, who was using Camacho's Phone, had another telephone conversation with CW1. During the conversation, Camacho and CW1 discussed how to conduct the methamphetamine transaction later that day.

At approximately 1:35 p.m., CW1 and CW2 went to the Blue Island Business and met there with Camacho. Before arriving, law enforcement officers gave CW1

and CW2 a recording device to surreptitiously record their conversations that afternoon. Law enforcement also gave the cooperating witnesses about $10,000 to use to purchase the methamphetamine. After CW1 and CW2 arrived, CW2 asked Camacho, "Well, how should we do it?" Camacho responded, "Should we go over there?" CW2 replied, "Let's go." Camacho then said, "[*Unintelligible*] or should the three of us go?" CW2 responded, "It's up to you." Camacho said, "Well, yeah. We'll go shortly. [*Unintelligible*.] If you want, you and I can go, and you can drop [CW1] off at home. We'll get in contact with you shortly, shortly to . . . ." CW2 responded, "So he can come by with the . . . ." Camacho answered, "Yes, so you can come to the dealer. [*Unintelligible*.]" CW2 asked, "Yeah?" Camacho said, "Let's go. Come on let's go, you and I [Camacho said for Camacho and CW2 to go together to meet the supplier]." CW2 responded, "OK. I'll tell him shortly." CW1 then asked, "He wants to take you . . . ? Do you want to take [*unintelligible*]?" CAMACHO answered, "Yeah, shortly. No, no, no. What for?" CW2 replied, "No, he says no." A few moments later, CW2 said, "That's what I mean. We'll go over there and see what's up. And if possible you can call . . . . Those things are there, fellow countryman." A few moments later, CW2 asked, "But is this fucker working right now or what?" Camacho asked, "Who?" CW2 answered, "[*Unintelligible*] this dude." Camacho answered, "Well, the son of a bitch wasn't there the day I went. He might be there right now, because it's time to go pick up the kids from school." CW2 then said, "Yeah. [*Unintelligible*.] Well, it's up to him. If he wants to come here or us [*unintelligible*] the money and well, if he has it [*unintelligible*]. Our car [*unintelligible*]. It's up to him, man. I don't care."

A short time later, CW1 departed the Blue Island Business by himself and met with law enforcement officers for a debriefing. Meanwhile, Camacho and CW2 remained together. Camacho asked CW2, "Is [CW1] going to wait for us here or did he leave already? Did he leave already?" CW2 responded, "[*Unintelligible.*] He's on his way home. It's close by. That's why I'm telling you. It's up to you, man. We'll talk to him." Camacho said, "It's just that you know what the problem is? First we need to make arrangements for sure, because what if we go with the money and the cops pulls us over?" CW2 responded, "Yes, it's just that it's tough." Camacho said, "And it will all go to shit, man." CW2 responded, "No, that's why." Camacho said, "[*Unintelligible*] the money and . . . ." CW2 responded, "And then we're not even sure how things are looking over there. That's the problem. To be moving like that, no. It's up to you. If that shit is ready right now, [CW1] can go or we can come by. It's up to you, man. I don't care." Camacho replied, "No, I'll just make arrangements with that guy right now." CW2 then said, "No, that's why I'm telling you. So we'll come by and then we'll go? We'll [*unintelligible*] with him or what's the deal? What do you want to do?" Camacho responded, "Well, we'll talk to him right now. [*Unintelligible.*]" CW2 replied, "Yes, we'll see what happens." Camacho then said, "Whatever he says. I honestly don't know. What I think is, I thought of asking that guy for a fucking, a sample like the one from the other day." CW2 responded, "No, but what for? No, no, no. This guy will pull through. He said, 'No, why would I ask you?' He said, 'No, no.' He said, 'I'll buy one from you guys and from there I'll [*unintelligible*] and if I like it, we'll keep working, and if not, well . . . .' He said, 'From there I'll tell you, you know

34

what? I need two more or whatever [*unintelligible*], but I need to look at the thing. [*Unintelligible.*] The money is there. The money is there.' Well, he's the man, right? He's the one who will say. That guy."

A short time later, Camacho and CW2 departed the Blue Island Business together. At approximately 2:37 p.m., law enforcement officers observed Camacho and CW2 arrive in the vicinity of 223 E. 116th Street in Chicago. Camacho said to CW2, "This guy doesn't come out." CW2 responded, "Really?" Camacho said, "He doesn't come out. You saw that those fuckers passed by and stared at us." CW2 responded, "Either way [*unintelligible*] this guy." At around the same time as this conversation, surveillance observed a male individual exit an apartment located at 223 E. 116th Street and approach Camacho and CW2 in their vehicle. Surveillance then observed the individual engage in a brief conversation with Camacho. According to the recorded conversation, Camacho said to this individual, "Dude. When you have a chance please tell the guy with the white car to call Marco. This white one. Call him. Tell him, 'Marco said for you to call him.' Thank you, OK? Bye." The individual then returned to the apartment, and Camacho and CW2 left the area.

At approximately 2:41 p.m. (Session 18950), Camacho, who was using Camacho's Phone, had a telephone conversation with Lozano. At the time of these calls, Camacho was in the presence of CW2. During the conversation, Camacho said, "Listen, um . . . the guy who bought the house over there in um, what do you call it? Over there in Calumet City. He says, I mean, he wants to buy the windows from you, but he wants to buy . . . . Right now he has enough to buy just one. One of the 30x32

kind. I mean, he only has enough for one. If you can head this way, so you can bring it here, um, and so he can give you the money." The call dropped, and Camacho and Lozano began another call (Session 18951). During the conversation, Camacho said, "The deal is here." Lozano responded, "I'll be right over. I'll be right over, it's just that I think that . . . the hour to install . . . well . . . ." Camacho replied, "Bring it, Bring it. Yeah, well, I, I had already told the, the guy that you would charge him, 950 per hour with that worker. I said, 'Well, yes, that's fine.' . . . So he said yes, dude. He said yes. . . . He said yes. In other words, bring it over. The deal is right here. So that you can take the sample over to the man of the house and so he can see it and that's it . . . . He already has a deal over here, dude. Come over." Lozano then asked, "You can't come over here?" Camacho responded, "No, well, I was there. I was there, fucker. It's just that . . . ." Lozano replied, "It's just that I'm just arriving." Camacho then said, "No, well, whenever you have a chance. That's here, dude. It's just that . . . . It's over here, dude. What I'm saying is, you can come over here at ease to the dealer." Lozano responded, "All right, then." Camacho replied, "I'll be waiting for you here." Lozano answered, "All right I'll be right over."

At approximately 2:51 p.m. and 3:12 p.m. (Sessions 18956 and 18967), Camacho, who was using Camacho's Phone, had two telephone conversations with Lozano. During the conversations, Lozano told Camacho, "I'm going to be the, by the ranch right now, right now. . . . I need you to head that way." Camacho and Lozano then discussed when and where to meet and who would pick up the methamphetamine. At around the same time as those calls, CW2 asked Camacho,

"What happened?" Camacho responded, "He's going to head to the ranch. He said he's going to head to the ranch on Kedzie. . . . Yes, he says he'll come to the ranch shortly." CW2 asked, "Oh, yeah?" Camacho answered, "So you can call [CW1] and shortly . . . . You know where the ranch is, right? It's on Kedzie." CW2 answered, "Yes, yes. It's here on the . . . ." Camacho said, "On the [*unintelligible*] over there." CW2 then said, "Yes, yes. Well, it's just that there are a lot of ranches there." Camacho responded, "I will tell you where shortly and that's where you're going to go. You're going to go with, um, with [CW1]." CW2 asked, "OK. To that ranch?" Camacho answered, "Yes, go there. That's where you're going to go shortly. He told me already, '[*Unintelligible*] at the ranch. I'll wait for them there, OK? I'll call you shortly once we're there [*unintelligible*].'" CW2 replied, "That's fine. . . . OK, but is he going to want to do it there?" Camacho answered, "Yes, yes!" CW2 said, "No, no, I'm saying the [*unintelligible*]." Camacho responded, "Well, he's going to take that and you're going to take the money." CW2 replied, "Oh, all set. That's better."

At approximately 3:28 p.m., surveillance observed Camacho drive with CW2 to the ranch, which is located at 3101 W. 153rd Street in Markham, Illinois. At approximately 3:41 p.m., Camacho and CW2 arrived at the Blue Island Business and remained in the vehicle. Approximately ten minutes later, Camacho and CW2 departed from the Blue Island Business, and subsequently Camacho dropped off CW2 at a restaurant approximately one block north of the Blue Island Business.

At approximately 3:57 p.m. (Session 18976), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation,

Camacho instructed CW1 to pick up CW2 at the restaurant. Agents then instructed CW1 to pick up CW2. Surveillance observed that when CW1 arrived at the restaurant, Camacho arrived immediately thereafter. Camacho then had a brief conversation with CW1 and CW2 and then returned to the Blue Island Business.

At approximately 4:09 p.m. (Session 18981), Camacho, who was using Camacho's Phone, had a telephone conversation with Lozano. During the conversation, Lozano said, "Hey, I'm on my way over there for that, all right?" Camacho responded, "These guys . . . fuck . . . ." Lozano replied, "Nah, don't start with . . . ." Camacho then asked, "Listen, is it, is it where the, the, the red facade is?" Lozano responded, "Yes." Camacho asked, "Right there where the red facade is? Where those things are stored?" Lozano responded, "Yes." Camacho then said, "OK. They're heading right over, man. OK, how long?" Lozano responded, "In 20. Tell him right away so that we can do that in a flash." Camacho replied, "OK, man. Bye."

At approximately 4:11 p.m. (Session 18982), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. During the conversation, Camacho said, "In 20 minutes, tell him go to where I went with him." CW1 responded, "Where to?" Camacho said, "Where I went with him." CW1 asked, "In twenty minutes?" Camacho answered, "Yes. . . . Tell him, tell him to go there, please." At approximately 4:24 p.m., CW1 and CW2 left to meet with Lozano at the ranch. Surveillance then followed CW1 and CW2.

At approximately 4:29 p.m. (Session 18985), Camacho, who was using Camacho's Phone, had a telephone conversation with Lozano. During the

conversation, Lozano said, "It's done." Camacho responded, "You're already there?" Lozano replied, "Yes." Camacho then said, "This guy [CW1 and CW2] is coming shortly." Lozano responded, "All right, then." At approximately 4:30 p.m. (Session 18986), Camacho, who was using Camacho's Phone, had a telephone conversation with CW1. CW1 consensually recorded the conversation, which was monitored by law enforcement. During the conversation, Camacho said, "They're waiting for you there." CW1 responded, "I'm here already, there's no one here." Camacho said, "Oh, fuck." CW1 then said, "I'm here. I don't see anyone around. Could it be that man who's over there at the red house?" Camacho answered, "Yes. . . . It's where you see the horses there." CW1 then said, "OK. I'll set aside your five [$500] bucks, eh. Did you hear me?" Camacho asked, "Did they see you?" CW1 answered, "No, no, well he went inside. Maybe he's bringing the stuff, I don't know." A few moments later, Camacho told CW1 the number for Lozano's phone and said for CW1 to call Lozano directly, which CW1 did.

Testimony from surveillance agents as well as the cooperating witnesses will establish that at around 4:32 p.m., Lozano handed approximately 511 grams of methamphetamine to CW1 and CW2 at the ranch in exchange for about $10,000. Shortly thereafter, CW1 contacted agents and said that the transaction was complete. Agents then instructed CW1 and CW2 to meet agents at a pre-determined location for debriefing. At approximately 4:51 p.m. (Session 18990), Camacho, who was using Camacho's Phone, had a telephone conversation with CW2. CW2 consensually recorded the conversation, which was monitored by law enforcement. During the

39

conversation, CW2 told Camacho that CW2 had Camacho's receipt and wanted to meet with Camacho to give him the receipt. Camacho told CW2 to hold onto the receipt, which Camacho said he would collect from CW2 at a later time. According to CW2, "receipt" was coded language for the $500 commission that Camacho wanted in payment for brokering the methamphetamine transaction.

On or about February 28, 2015, at approximately 12:28 p.m., Camacho was seen over a closed-circuit television installed in the Blue Island Business meeting with CW2. According to the video, during the meeting, CW2 paid Camacho a quantity of cash. According to CW2, CW2 owed Camacho $500 as a broker's fee for the methamphetamine deal between Lozano and CW1 and CW2. At the direction of law enforcement officers, CW2 went to the Blue Island Business to meet with Camacho and pay him that money.

## **Argument**

## I.    **Admission of Evidence of Uncharged Conduct under Rule 404(b).**

The government anticipates that Camacho will argue that he was entrapped into aiding and abetting (that is, brokering) the charged methamphetamine distribution. To raise an entrapment defense, a defendant must make an initial showing: (i) that he was induced by a government actor to commit the crime at issue; and (ii) that he was not predisposed to commit that crime. *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014); *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010). The government's offer of a run-of-the-mill opportunity to commit a charged crime is not sufficient to establish entrapment. *Mayfield*, 771 F.3d at 431. Rather, "inducement means government solicitation of the crime *plus* some other government

conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Id*. at 433. That "other" conduct could include: (i) repeated attempts at persuasion, (ii) fraudulent representations, (iii) threats, (iv) coercive tactics, (v) harassment, (vi) promises of reward beyond that inherent in the customary execution of the crime, (vii) pleas based on need, (viii) sympathy, (ix) friendship, or (x) "any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts." *Id*.

The government is aware of *pro se* filings made by Camacho concerning his view of his interactions with the cooperating witnesses. R. 57; *United States v. Camacho*, No. 15 CR 367, R. 166 (N.D. Ill.); *United States v. Camacho*, No. 16 CV 4351, R. 1 (N.D. Ill.). But those pro se filings do not specifically address or identify how Camacho was allegedly entrapped. The government has asked Camacho for a proffer of the basis for his contemplated entrapment defense, including precisely how he was induced into brokering the methamphetamine deal. To date, the government has not received such a proffer. At this time, the government does not know whether Camacho will be able to make the required initial showing for this Court to give an entrapment instruction.

If, however, Camacho makes the required initial showing, the government will seek to introduce evidence of Camacho's prior conduct under Rule 404(b)(2) to prove Camacho's predisposition to commit the charged crime. According to Rule 404(b)(2), evidence "of a crime, wrong, or other act is not admissible to prove a person's

character in order to show that on a particular occasion the person acted in accordance with the character," but is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *United States v. Gomez*, 763 F.3d 845, 852 (7th Cir. 2014) (en banc). In *Gomez*, the Seventh Circuit explained that Rule 404(b) requires a "chain of reasoning that supports [a] non-propensity purpose for admitting the evidence. . . . [T]he rule allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." *Gomez*, 763 F.3d at 856; *see also United States v. Lawson*, 776 F.3d 519, 521–22 (7th Cir. 2015).

When a defendant raises an entrapment defense, evidence of prior bad acts is admissible to prove predisposition. *Lewis*, 641 F.3d at 783. That is because "in such a case the defendant's predisposition to commit the charged crime is legitimately at issue." *Id.* (quoting *United States v. Swiatek*, 819 F.2d 721, 728 (7th Cir.1987)); *see also Rebolledo-Delgadillo*, 2015 WL 13037308, at *4 (concluding, after the Seventh Circuit decided *Mayfield*, that the "assertion of an entrapment defense puts the defendant's predisposition to commit a crime at issue"). The court in *Rebolledo-Delgadillo* explained why prior-acts evidence is relevant and admissible in entrapment cases: "[M]ost, if not all, evidence of a defendant's 'predisposition' to commit a crime is propensity evidence; the notion of 'propensity-free predisposition evidence' is largely an oxymoron. If a defendant puts his character in issue by asserting an entrapment defense, the government may counter that defense with evidence that the defendant was predisposed, or had a "propensity," to commit that

42

crime." *Rebolledo-Delgadillo*, 2015 WL 13037308, at *4. Prior-acts evidence is this admissible because it would be "offered to rebut the defendant's claim of lack of predisposition (a claim inherent in the presentation of an entrapment defense)." *Id*.

In this case, the government's case-in-chief consists largely of the evidence discussed in Part II of the background section. If Camacho chooses not to raise entrapment as a defense, the government does not intend to introduce the evidence laid out in Part I.[5] But, if Camacho does indeed raise entrapment, all of his prior drug dealing with the cooperating witnesses would become relevant and admissible. Following the analysis in *Gomez* for admissibility under Rule 404(b)(2), the evidence of Camacho's uncharged drug dealings and attempted or contemplated would establish that Camacho was not somehow duped or induced by the cooperators to commit a crime he otherwise would have avoided. In other words, the evidence is relevant to prove that Camacho was predisposed to commit the charged methamphetamine-distribution crime.

What makes the uncharged conduct particularly relevant is how closely the uncharged conduct mirrors the crime with which Camacho is charged. Camacho is charged with aiding and abetting Lozano's distribution of methamphetamine. Camacho did not touch the drugs and was neither the buyer nor customer for the drugs. Instead, Camacho's role was to broker the deal by connecting the customers

---

[5]     The government asks for an opportunity to revisit requesting admission of evidence discussed in Part I of the background concerning uncharged conduct depending on events or arguments that take place prior to or during trial. Government counsel prosecuting this case are not sufficiently creative or clairvoyant to predict all the possibilities in which any or all of the evidence of uncharged conduct might become relevant and admissible.

(the cooperating witnesses) with the supplier (Lozano). Camacho's uncharged conduct was the same and occurred in the months prior to the charged transaction: In January 2015, Camacho spoke with the cooperators about providing them with narcotics. Camacho brought the cooperators to his Blue Island Business, where he introduced the cooperators to Antonio. There, while in Camacho's presence and with Camacho himself discussing the narcotics, Antonio provided a sample of heroin to the cooperators. Similarly, later in January 2015 and into February, Camacho repeated spoke with Paco about Paco supplying narcotics to Camacho's customers (the cooperating witnesses). Once again, Camacho did not plan to possess the drugs himself or be the individual to deliver those narcotics. Instead, he was attempting to broker the deal. These similarities between the charged and uncharged conduct make the uncharged conduct highly relevant to respond to an entrapment defense.

Moreover, because the government would be seeking to introduce evidence of Camacho's uncharged conduct to rebut his claim of lack of predisposition, the purpose of the evidence would be something other than pure propensity. In other words, the evidence would overcome the absolute bar set by Rule 404(b)(2). (That is why the government only intends to seek admission of this evidence in response to an entrapment claim.)

That leaves analysis of the evidence under Rule 403. While the evidence would be highly relevant and probative to respond to a claim of entrapment and lack of predisposition, its admission would not be unfairly prejudicial, unnecessarily cumulative, or a waste of time. The evidence of Camacho's involvement in prior

narcotics deals would only come in if Camacho were to open the door. Once that door is opened, Camacho could not possibly be unfairly prejudiced by the government introducing evidence to counter Camacho's claim. That is because, the more instances of prior drug dealing with a wider variety of narcotics and suppliers the government is able to show, the weaker and less credible Camacho's claim of lack of predisposition would become.

For these reasons, the government asks for the Court to allow admission of the government's evidence of prior, uncharged drug dealing if Camacho chooses to raise an entrapment defense.

## II. Admission of Coconspirator Statements under Rule 801(d)(2)(E).

The statements made to Camacho in the conversations that the government seeks to introduce at trial are admissible as non-hearsay statements to prove Camacho's understanding of what was being discussed in the conversations and to prove what Camacho meant the various statements he made. Moreover, the statements by Antonio, Arturo, Paco, Lozano, and other co-schemers with whom Camacho communicated (other than the cooperating witnesses) in connection with drug-trafficking activities and plans are also admissible as coconspirator statements under Rule 801(d)(2)(E).

### A. Governing Law.

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance

of the evidence that: (1) a conspiracy existed; (2) defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. United States v. Cruz-Rea, 626 F.3d 929, 937 (7th Cir. 2010).[6]

### 1.     Existence of and Membership in the Conspiracy.

Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the trial judge must preliminarily determine whether statements by a coconspirator of the defendant will be admissible at trial under Rule 801(d)(2)(E). In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *Santiago*, 582 F.2d at 1143; *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (i) a conspiracy existed; (ii) the defendant and declarant were members of the conspiracy; and (iii) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134–35; *see also, e.g., Alviar*,

---

[6]     No Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant. Such statements are not testimonial, and therefore are not subject to the Confrontation Clause. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

573 F.3d at 540. According to *Bourjaily v. United States*, 483 U.S. 171, 176–81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Rule 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of coconspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

The Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it. *Bourjaily*, 483 U.S. at 178; *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009). But the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549–50; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant

knows, has met, or has agreed with every coconspirator or schemer. *Longstreet*, 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("[I]t is irrelevant when the defendant joined the conspiracy so long as he joined it at some point."). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604–05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context, or other evidence) that the declarant was in fact a coconspirator. *Id.*

### 2.    The "In Furtherance of" Requirement.

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea*, 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529,

533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010).

In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *Alviar*, 573 F.3d at 545 (quotations and citations omitted); *see also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made: (i) to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533[7]; (ii) to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545; (iii) to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513

---

[7]     Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

(7th Cir. 2008); and (iv) "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).

Finally, any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera*, 136 Fed. Appx. 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

## B. The Evidence Regarding the Existence of Conspiracies and Camacho's Participation in Conspiracies.

At trial, the government plans to introduce the evidence discussed in Part II of the background section above. The numerous phone calls between Camacho and Lozano establish that the two worked together to delivery methamphetamine to CW1 and CW2. Additionally, testimony from CW1 and CW2 as well as law enforcement officer testimony concerning surveillance on February 25, 2015, also establish that Lozano and Camacho worked in a conspiracy to deliver the methamphetamine to the cooperating witnesses. Specifically, that Lozano and Camacho agreed that Camacho would introduce the cooperators to Lozano (the supplier of the methamphetamine), who would then sell the methamphetamine to CW1 and CW2.

As discussed above, in the event that Camacho raises an entrapment defense, the government will also seek to introduce the recorded conversations, cooperator testimony, and surveillance concerning Camacho's early drug conversations with the cooperating witnesses, his work to broker the delivery of a heroin sample in January

2015, and his efforts to deliver additional narcotics to the cooperators with Arturo, Paco, and possibly others. The statements by Antonio, Arturo, and Paco all constitute coconspirator statements because the statements themselves, along with the delivery by Antonio of the sample of heroin, all establish that Camacho worked in conspiratorial relationships with each to try to arrange drug deals with the cooperating witnesses. Moreover, as was the case in the charged conspiracy, in each of these instances, Camacho acted as the broker, introducing CW1 and CW2 to the supplier of the various types of narcotics to buy narcotics.

### C. The Coconspirator Statements.

The statements that the government intends to introduce are explained in detail in the background section. Should the government seek to introduce additional statements, the government will alert the defense and this Court before seeking to introduce them.

The statements were made by Antonio, Arturo, Paco, and Lozano in furtherance of their various conspiracies with Camacho all concern subjects that were integral to the attempted drug deliveries. Under Rule 801(d)(2)(E), these statements are all admissible as non-hearsay statements.

### Conclusion

For these reasons, the government respectfully requests that the Court grant these motions.

Respectfully submitted,
JOEL R. LEVIN
Acting United States Attorney

By:     *s/ Paul H. Tzur*
PAUL H. TZUR
BRIAN S. WALLACH
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353–5300